May it please the court, opposing counsel. In short, your honors, the Sandifer family had an expert they were extremely happy with. He had produced reports, he had passed Doe-Bear scrutiny, and we were ready to go to trial. Then that expert, who was essential under this court's decision as steward, got terminal brain cancer and had to quit the litigation he has since passed on. The defendant's theory in this matter has always been that plaintiff, a well-respected doctor of dentistry, a family man, lifelong hunter, doing well financially, extremely close to his family, decided one evening for no apparent reason to draw his bowstring of his compound bow back, stick his head inside to fatal consequence. Both Dr. Gautam Ray of the University of Pennsylvania, our initial expert, and Dr. Kelkar, our substitute expert, approached the exact same set of questions and came to the same conclusions on those critical questions. The heart of our appeal lies in the propriety of the evidentiary restrictions applied by the court that were so binding and so harsh as to amount to a preclusion of that key expert. This honorable court, the Fifth Circuit, has not established guidelines for the substitution of experts, and the trial court did not either in advance outline guidelines for the substitution of experts, except that that expert should be of the same academic discipline as Dr. Ray, which is biomechanical engineering. Dr. Ray used mathematical modeling to establish that Dr. Sandifer's head had become entrapped by accident. Dr. Kelkar, the replacement expert, used a more test-based methodology, but he reached the same conclusion. The trial court found— Completely focus on, you know, sort of striking it because it was not in compliance. The scapel was so severe, it was to the bone. Once the meat had been cut off the bone, we had our expert say by affidavit, I'm a scientist and I cannot confine myself in my opinion to these parameters. So if I'm not allowed to, for instance, talk about my testing methodology or talk about this, I cannot testify and be do-bear. I cannot testify and defend my position on the stand. But he didn't replicate what Dr. Ray had done. He did replicate what Dr. Ray had done in terms of, again, the questions he was presented with and the conclusion they arrived at. No, did he do the mathematical model? He did not do mathematical modeling. So he didn't say, I agree with Dr. Ray's mathematical model and I've done the work myself and here it is. What he said was, I have looked at Dr. Ray's methodology. That is a fair methodology, but it is not my methodology. He had a completely different methodology to come to the same conclusion that Dr. Ray. I would agree. It was a mathematical modeling approach versus a more physical testing-based approach that was adopted, for instance, by the defendants expert. I thought he said he disagreed with the first doctor. Is that? That is incorrect. Much was played up of a tiny snippet of a seven and one-half hour grueling deposition. What Dr. Kelcar said was there was a portion of, and they had some discrepancies, and my argument here is that any two independent scientists approaching the same question independently will necessarily have some discrepancies. But over and over again in his deposition, Dr. Kelcar said, I don't see what the big deal is. Yes, he said it maybe was versus two inches, but we came essentially to the same conclusion. But much has been made of Dr. Ray's use of the term inertial force, which, by the way, is not scientific mumbo-bumbo. It was suggested in some briefing. Every single one of the scientists, every single one poised to the defendants and our own all said, yes, inertial force is a thing. It is Newtonian physics. But Kelcar said in his deposition, I have read the dry deposition with questions asked by defense counsel, and I've read the report, and I'm still confused as to what Dr. Ray is saying at X location in the report on inertial force. I was not able, says Dr. Kelcar, to talk with Dr. Ray scientist to scientist, man to man, and figure out some of the nuances of what he's saying. I just don't understand this particular segment. It's also my understanding from reading the briefs, and you can correct me on this, is that the final expert, Dr. Kelcar, never came to an opinion that specifically said that he had reached a professional opinion that supported his view of it over that of the defendants' expert. Is that correct? That is incorrect, and I think it's a critical point overall. What Dr. Kelcar said was, and this gets into the approximate cost question of the latter part of the briefing, what Dr. Kelcar said was during the reasonable course of this bow, and everyone has admitted pulling one's bow string back for a compound bow, there's a few other reasonable uses, a few other reasons you would buy a bow except to pull back the bow string. During the reasonable bow string pull back, at some point during that process, the doctor's, Dr. Sandler's, left hand shooting hand, which supports what's called the riser of the bow, the handle if you will, it lost control. I find that it accidentally lost control by virtue of a bunch of other scientific criteria, but for some reason he lost control with this hand. And then in great scientific detail, and basically only one scenario he describes, what happened mechanically, and that's by mechanics, the interaction between that machine, the bow, and the human body to where it ended up wrapped around the doctor's head with a piece of the bow, which is an untapered, unguarded metal rod pointing back at the shooter, through the temple into the doctor's brain stem. What the defendant was hung up on in the court apparently was, he did not say, I mean it's ironic, he refused to speculate. There are several different things accidentally that could have happened to the doctor's hand. He could have had sweaty palms. He could have had arm fatigue, arm cramping. All of that foreseeable, all well within the purview of the reasonably anticipated use of that bow, as admitted to by Hoyt's own expert. One of the men who led the team to design the very bow in question said, I'm a competitive shooter. People's hands slip. I've seen it. My hand has slipped. I've dropped my bow. But there was, I mean, that seems like it was nothing but speculation because, I mean, he never said that my theory is more probable of what occurred than that has been offered by the defendant. He did, and he did at the critical time because the LPLA says, look, I've got to show reasonably anticipated use and I've got to show that the injury was caused approximately by defective condition of the bow in reasonably anticipated use. So he says, look, I find more probably than not, he said it all more probably than not, to a reasonable degree of scientific certainty, something happened that the doctor lost control. It could have been a hand slipping, arm fatigue. From that point on, exactly what happened, he described the mechanics of what happened that placed, again, accidentally. The dichotomy here is intentional versus accidental. Did this man open up his bow one evening and stick his head inside, which Hoyt said is the only way, their science said is the only way this could have occurred? Or alternatively, did this happen by accident in a situation that Hoyt should have foreseen? So he absolutely said, more probably than not, once accidental control loss, control was lost accidentally, this is the sequence of events, more probably than not, based on my testing that occurred. And it can't happen accidentally. But he did say that his theory was no more probable than that the opinion of the defendant's expert was plausible. He said it was plausible. He said his was absolutely more probable. He absolutely said his accidental scenario, as did Dr. Ray before him, was more probable than not. And although the defendant's was plausible, it is physically possible, he said, for a super strong guy who was so inclined to open up one's bow and stick your head in. It would take an enormous amount of physical force. It would take, by Hoyt's own admission and their experts, an enormous amount of concentration. But it is physically possible. But he absolutely, his report, his deposition, he said it was more probably than not that this was an accident, and that was supported by several types of evidence. Well, I mean nobody suggested it was an intentional act, or at least they denied it. I mean nobody, the defendant, I mean, denies that it is accusing the doctor of having committed suicide. It's not, well, they dance around the suicide language because that's harsh language for such a good guy. But they say, I mean Dr. Bowles, Alfred Bowles, their biomechanical engineering expert, has been through this process, absolutely says there's one way this occurs. He had to intend to put his head in the pocket. Now he may not have intended to have his hand lose control, but he had to commit the act. The vote says Bowles. Our guy says that's silly. Dr. Ray says that's silly. But they absolutely said this was an intentional, volitional act to open up his bowstring and stick his head inside. But he was looking, they haven't sounded to me like he was looking online for a particular part. He had magazines open in front of him. And no, that did not suggest to me that he was saying it was suicide, that he was doing something with his bow, trying to figure out what part he wanted or how it would fit. No, I didn't get a hint of suicide from that. He was figuring out what part or some part he wanted to add to his bow. That is going to be, we filed a motion to eliminate on that. That was going to be addressed in the event that Dr. Ray had not died. The only part he's saying, there's no evidence of that. There was a magazine open. There was a computer screen open. I thought his wife testified. She asked him what he's doing. He said, I'm looking for a part for my bow online. He was looking for a part with his bow online. In terms of the scientific explanation of this unwitnessed accident, that is purely the argument of counsel. Dr. Bowles, their biomechanical engineer, and Gideon Jolly, their mechanical engineer, both said he would have had to. This was an extraordinarily difficult task. I don't argue with that. My only point is, no, I didn't take from that a suggestion of suicide. No, ma'am. I just took that as a suggestion that he was fiddling with his bow that night. There may have been some reason to stick his head in there. I don't know. It wasn't suicide. It's my only point. And I agree with the distinction. The distinction is I intended to kill myself, but they cannot run from their own experts. They say it was a volitional act, and it could only have been volitional. It couldn't have been an accidental situation where he was not paying attention or looking at that magazine. That's not what their experts say. No one – I'm not arguing that. Okay. I just want to make sure, because I think that's an important distinction. That's not what I'm saying at all. I'm just saying no one – I didn't get a whiff of suicide. I agree with Your Honor. In terms of – Kelcar comes in. We are told in a text-only entry, you are allowed, Counselor, to replace your biomechanical engineer. We replaced the biomechanical engineer with Dr. Kelcar. Well, I mean, the district judge obviously thought you had completely changed – not completely, but you had substantially changed your theories and had substantially expanded the expert's testimony beyond that of what your first expert did. When the case was ready for trial, and then when you get an opportunity, you open up completely new issues. I mean, this is what she apparently thought. And you have not complied with my request of getting an expert that will essentially say the same thing that the expert that you have when it's ready for trial now would say. We don't want to postpone this by introducing new theories. Why did the district court abuse its discretion by excluding that expert testimony that she perceived had the effect of defying her orders, introducing new evidence, and prolonging the trial? The timeline and instructions to Counselor, myself, and my law partner are critical here. Dr. Ray was prepared for trial. We love Dr. Ray. I loved him until he passed. Excellent expert. I did well with him before, so we were ready. He got terminal brain cancer and had to bow out. Hoyt insisted that I go get from his son proof that he was sick before they agreed to continuance, but I got it. The court said he's got terminal brain cancer. What can be done? The parameters I was given as Counselor was that Counselor, you need to go get a biomechanical engineer. You will have the following scheduling order in terms of he needs to identify himself. Thereafter, he needs to issue a report. Thereafter, he will be deposed. Thereafter, the defense experts will be able to produce reports in contradiction to whoever you choose. Finally, there was a motion for limiting deadline. That was done and instructions were followed to a tee. I got a biomechanical engineer. He submitted his report exactly on time. He underwent a seven and one-half hour grueling deposition. Their experts were allowed to respond through supplemental reports. They were deposed. I asked them, you got everything you need? Anything else you wanted to do? Any other document? No, we are golden. We're ready for trial. Then we got to the edge of trial. The trial was bumped sua sponte by the court's own motion because there was a great deal of motion practice. To answer your question, this wasn't a situation where I put out this report and we didn't have any more time. I sprang this new guy with new theories, which they weren't. Again, we say he didn't violate the scope. These weren't new theories. But even if they were, which I contend they weren't, we had a situation where defense was ready for trial. There was no prejudice whatsoever. Everyone was ready yet again to try this matter. Their own experts said we are in at least a good a position, if not a better position, than we were with Dr. Ray. Let's go to the jury. Dr. Ray did file a report, is that correct? He did. That report would be admissible, notwithstanding the fact that he was not available. It would have been admissible to turn him to the jury? Exactly, admissible at trial. Did you ever use it, Dr. Ray's report? I did not use Dr. Ray. We didn't get that far. And a decision was made that we could replace the expert. I don't know how long I can go on. But a decision was made we could replace the expert so there was no need to do something like submit a report. At some point, when the judge disallowed your expert, you could have followed back on Dr. Ray's report, I suppose, could you not? I could not have judged because a motion for summary judgment was granted by the judge. It was clearly canned and ready to go. It was hit with me the next day. Without Dr. Kalkar and without an expert, I was done. And I knew it and I had to concede that. There was no getting around it. And I conceded in brief writing. This was critical expert. So we could have gone back to report. I would argue that a dry report would be some case suicide to a jury. When they got a live body speaking science and a very cold scientific report, I can let a jury leaf through. But I wasn't given that sort of draconian option. I was given a motion for summary judgment dismissing my client's case after four years of strenuous preparation, 30 depositions, and motion practice to work. Was she granted a motion that had been pending for a while? Well, what it was, they filed a motion for summary judgment saying Kalkar should go. He's no good. And, therefore, it was just the truth. I can't run from it. I had to have an expert. There was no getting around it. Without the expert, I couldn't meet my burden of proof. So it says Kalkar goes and we win. And the judge came in and says, Kalkar goes and you win. So, I mean, it was not like the district court decided that the expert was inadmissible and it automatically followed that summary judgment would be granted. Correct. What was the basis for Kalkar going in the motion? They said he should not be allowed to testify because. He cannot be allowed to testify. I mean, there was a number of reasons. It was a scaffold taken to the report. Was one of them that his expert testimony differed materially from Dr. Rice? Yes. Again, although we had not given . . . I disagree on that. And we had not been given an instruction in advance by the court that that was the way it was supposed to be. All right. And as I understand the record, for the most part, we have minute entries from the court as opposed to there having been hearings and written rulings and all that. Is that a fair characterization? Right. The instructions I was given, it was in the form of a text-only entry, basically a long sentence and a scheduling order. And the text-only entry says you're allowed to go get a new biomechanical expert to replace your old one, and here is the schedule ordering to which you must abide. And he must abide. And it laid out a lengthy schedule order that went on for months. Every bit of it was done on time, without exception, without even asking for an extension. All right. Thank you. Mr. Martin? Well, I'm thinking there was some implication, if not direct, statement of considering this in the sanctions arena. And I take it that was not addressed, though, whether or not it was indeed a sanction as opposed to an evidential ruling by the trial court. Is that correct? I think the trial court said it was not a sanction. I think there's no other way to fairly characterize what occurred. There was an ostensible, I disagree strongly, that there was any sort of violation of the discovery order. But it was treated like you violated my discovery order, and therefore my punishment, if you will, is to throw out your case after four years. But there's nothing in writing where the judge said it was a sanction. No. Not only have you gone beyond the scope of my order, but, you know, you violated it to the tune of my proposal. There's nothing we would find in writing saying that. It just would be the argument you make based on the impact of it. Is that right? Yes, Your Honor, and the case law from this honorable court, which treated this kind of thing like a Rule 37 analysis and sanction. All right. I just wanted to make sure my recollection was correct. Thank you. You've reserved a vote of time. Thank you. All right. Mr. Popson. May it please the Court, Counsel. My name is Jim Popson. I represent Hoyt Archery Incorporated and National Union Fire Insurance of Pittsburgh, Pennsylvania. The trial court's opinion and order should be affirmed because Dr. Kelcar's testimony was inadmissible under Dobear. Appellant cannot prevail in this case because inadmissible character and propensity evidence was a necessary component of Dr. Kelcar's opinions that Dr. Sandifer handled the compound bow in a reasonably anticipated manner. There's certainly no manifest error in excluding an expert's opinion that requires the expert to rely on inadmissible evidence. The appellant here was not victimized by discovery sanctions. They simply— Inadmissible evidence. I guess you're alluding to the statements that somebody might have made about, well, it would have been not like him to put his head in the bow. Is that what you're referring to? Right. I think that the way this case needs to be analyzed, first and foremost, is was the expert's testimony admissible to begin with? Well, I understand that part, but you were making your sort of argument about the expert being painted with inadmissible evidence, etc., and from what I read, the only thing I could glean is that you were adverting to an element of evidence, either the wife or neighbors or somebody who reportedly would have given some kind of habit evidence. Is that what you're alluding to? That is what I'm alluding to. All right, not within the scheme of mechanical or methodological opinions. That's not what you're talking about. I haven't gotten there yet. That's separate and apart. Okay. But at its core, the simplest way to look at this is we have an expert who admitted that he could not testify that there was a reasonably anticipated use of the product unless he considered this propensity or character evidence. It's that simple. He admitted that. Now, plaintiffs say, well, he said he relied on a number of other things as well. We don't dispute that. He did rely on a number of other different things. But those things were not sufficient for him to be able to testify to a reasonable degree of certainty that there was a He said he did a mathematical calculation of whatever his model was. I don't understand. I didn't read all that. I didn't get all that. The anchor of his opinion was this habit evidence that he did not have a theory that was different from the first expert. Was it hints on this other evidence? I mean, I saw that part of it, but I never got from it that his whole opinion was anchored to. In other words, if he didn't have the evidence of habit, he could not render a scientific opinion. Is that what you're saying? That was his testimony. That was the testimony of that expert. He testified to that. And, of course, an element, as plaintiff or as appellant's counsel concedes, the element that they have to prove is a reasonably anticipated use. And the court is already on to the issue. No one is saying that, obviously, this gentleman was intended to commit suicide. What we have here is a dispute between, and there has been from the outset of this case, between a volitional act or a non-volitional act. And that kind of demonstrates the difference between what Dr. Ray said and what Dr. Kelkar said. Dr. Ray, as a biomechanical expert, offered opinions about the movement of the human body. He testified that we thought this was not possible, could not happen, but somehow within one tenth, it takes less than a tenth of a second for the string to close. But somehow he had a physical reaction to that that caused his head to move inside. Bodily movement. He moved inside. In other words, Kelkar essentially, I'm sorry, Ray essentially puts the head inside the string as well, but through inertial movement of the body. Now, the new expert comes in and says the body didn't move, the bow moved. Entirely different theory. Entirely different theory. But in order for him to give the opinion that the head was outside before this bow was released, he testified that I need to rely upon the inadmissible propensity evidence. He testified that if I ignore that, then the theory proposed by the defendants expert, Dr. Bowles, is just as likely. That's the testimony. So the question is, under the law, is that sufficient to be admissible in this circuit? And I think the answer to that is clear. It's no. I think in any circuit or in any court in the federal courts, we have to have something more likely than not. Otherwise, we're left to speculate. You're correct, which I don't say that you're not. I just didn't get the sense that that was the heart of the district court's exclusion, what you just said. But, you know, I'm not going to say I know this as well as you or other counsels. But I got you. It's what you're saying. We'll look more closely. I saw that about the habit piece, but saw it as somewhat ancillary to the principal opinion, but more to the point. That not being, it was the going beyond the scope, if you will, of the first expert's testimony, was what I thought was the heart of her striking it, not this additional factor about habit. But I take what you say as being the case, and we'll look at it in the deposition and all that. I just wanted to make sure I understood it, and you've done a good job of explaining it to where I can't understand what you say infected his opinion. As far as what the court actually ruled, she ruled on both grounds. And I think if you take a look at the ruling on the motion for reconsideration in particular, the judge specifically states, the trial court judge states, that there were multiple reasons for excluding the witness, one of which was his testimony was inadmissible. On its own. And second, that it was beyond the scope of the prior expert's report. As counsel noted, there is not a lot of case law, or there's no case law, in the Fifth Circuit regarding substitute experts that's binding and controlling. But there's case law out there. It's scant, but most of it is from the district courts who have to deal with this problem, probably on a more regular basis. But substitute expert means substitute expert. If a party wants to introduce new opinions because maybe they didn't like the opinions or they weren't comfortable with the opinions of their prior expert, they're supposed to disclose that up front at the beginning. And what the appellants are doing here is effectively blaming the court and saying, it was the court's fault because they didn't give me enough guidance. They didn't tell me what I was supposed to do. Well, it's a substitute expert. And a substitute expert, first we have to assume that everything that- What did the court say in allowing the substitute expert? The court's orders state that she made it very clear to all the parties and to the appellants' counsel that basically there was not going to be any substantial revisions or any substantial additions or revisions to the prior opinions that had been given by the expert. She lists a number of things that she stated to appellants' counsel and appellees' counsel with regard to this. Now, as appellants' counsel points out, it's not in any written order. She says, I verbally gave these directives. But to my point, though, is that she doesn't have to give any directives. Are we going to require all federal judges in the federal district courts that every time there's a substitute expert that they have to issue an order that specifically states what the substitute expert is permitted to say? Well, it may not be that, but let's be real. This is not a typical case. I mean, it's not typical in the sense of you've got-it's not like a body shop mechanic. You know, you lose one, there are 100,000 body shops. You go get somebody to testify about repairing a transmission. This is seemingly to me a pretty-a more narrowed sphere. You're all geared up for trial forever, and then the expert gets brain cancer. So it's not like some cases we have where, you know, they wait until the last minute to get an expert or whatever, whatever, whatever. So, frankly, to me it would not be unreasonable that there was some kind of written parameters and all that. But putting aside that, you get to this unexpected, and even you don't contend, you know, this was feigned. A man got cancer. I mean, what are you going to do? You know, he died. So it's such an extraordinary and atypical situation here with an expert. I don't know how many kinds of experts in this arena there are, but it strikes me that given this bow and all that, there may not be 100,000 people, you know, who could do that. But putting that aside, he doesn't argue, you know, he couldn't find one and all that. But it is a little hard for me. I've read this, you know, in terms of what the judge said and meant and all that. You know, it's easy to say after the fact what I meant, but it doesn't seem to me to say that, given all that transpired here. In fact, the case law that's out there from the district courts, for example, there's a case out of Puerto Rico where it is expected that the scope of the new expert's report will be addressed after that report comes out. You know, the party that is the non-movement in that situation is free to, you know, challenge that that's beyond the scope. That's not a substitute. To me, as far as the substitution of an expert is concerned, the rules are different, depending upon when you're substituting the expert. If you're substituting the expert right before trial or if you're substituting the expert after everything is ready to be tried, you're not going to change the expert's testimony. That's going to prolong the case. You've got to stay within the parameters of which the case exists at the time you had to have another expert. That's all. And if you did it very early on for extensive deposition, there would be less stringent rules. And that sits on the end of, I guess, the prejudice scale. That's a factor to be considered in the prejudice scale. And I also should point out that Your Honor raised the issue of whether appellant's counsel inquired to the trial court as to whether or not they could then rely, given the exclusion of one witness, could they rely on the testimony of the original witness, either through deposition or submitting a report or wherever the case may be. Did you assert prejudice? Yes, we did. I mean, in your motion. Yes, in our motions, yes, we did assert that we were prejudiced, and it had to do with the number of people that have worked on this, how many depositions were going to have to be taken. It was a laundry list of things. But the point I was at before is that these guys, they took the time to file a motion for reconsideration on these rulings, and at no time did they suggest to the court that they would like to proceed forward with Dr. Ray's testimony or with Dr. Ray's report. They had every opportunity. He kind of portrayed that he didn't have an opportunity to do that. Well, he took the time to file a motion for reconsideration. He could have raised the issue then. They chose not to. The bottom line here is, I'm sorry, Your Honor, were you about to ask me a question? They say that you and your experts conceded that there was no prejudice to them. They examined Kelcar's testimony, and they thought they were in a better position than they were when Dr. Ray was the expert. What's the response to that on prejudice? Well, we were ready to go to trial. We were going to do it. We filed motions to reopen Discovery because of the different work that was done and the amount of work that was done. They opposed those motions. Was Discovery reopened? Just to the extent that we took the depositions that were taken of Kelcar and I guess, I don't know if there was another one. Where was the prejudice if it was extended for you to get the Discovery you needed? But it wasn't. I thought you said it was. Well, we were able to take Dr. Kelcar's deposition, but I think there were requests made to take depositions of additional people. In the meantime, all these motions got filed, and the case was ruled upon. The testimony was excluded. So there was no ruling on our, my understanding is it basically became mooted. There was really no ruling on our request to do additional work. But yes, of course, our experts were prepared to go to trial. The other issue I wanted to raise is the issue on the zone of danger argument that was raised by plaintiffs. Essentially, what they're saying is that the two experts' testimony is the same, and if they can just say that it was an accident, that that is sufficient, that that's similar enough. And they are using the zone of danger, the line from Kampen, basically to say, well, any use of this product renders it dangerous. And that's because they recognize there's obvious problems with Kelcar's admissions, and they're trying to pigeonhole this in. A zone of danger argument should not be applicable here, because appellants must first establish a reasonably anticipated use of the product before you analyze any zone of danger. The citation for that is Savant v. Beretta. That's a district court case that relied on Kampen. It's a case involving a weapon, which I think is very comparable to this case. A gentleman was getting a shotgun out of the back of his truck when he went to grab it. The muzzle was pointing toward him. There was an accidental firing, and he was shot. He did not intend to shoot himself. He had no intent whatsoever to do that. And the plaintiffs argued, well, he placed himself in the zone of danger, and therefore we should be allowed to proceed because he was in the zone of danger. Those arguments were rejected because they have to establish first it's a reasonably intended use. And what these cases tend to say is anything that's an obvious danger, no, you should not do that. Those are not going to be reasonably anticipated uses, and Savant is an example of those types of cases. There's another that is Delphin, which is a Louisiana case. What is your argument now? Where are you going with this? Plaintiffs have argued that essentially because there was an accident that occurred, that the plaintiff was in the zone of danger, that that's sufficient to get past causation and reasonably anticipated use. And our point is that, no, you have to independently establish reasonably anticipated use, and that that's been established. In Kampen, there's two parts in Kampen. Kampen had an en banc hearing, and the plaintiffs are trying to rely on the holding in the first case. Kampen is the case with the jack where the plaintiff argued that the use of the jack for purposes of reasonably anticipated use was completed as soon as you finished jacking up the car. It doesn't matter that the plaintiff got underneath the car. But in the en banc hearing, the court held that it does include what the conduct of the plaintiff does count as part of the use. And in our case, the conduct of the plaintiff is the volitional, the head being placed inside between the riser and the string, as we say. So we have, you know, in other words, the plaintiff's conduct counts when we're looking at reasonably anticipated use. Finally, I'd like to finish with this is an abuse of discretion standard in this case. The plaintiff is required to demonstrate that basically the manifest error is indisputable, complete disregard of controlling law. And what we don't have here is controlling law that our district court judge disregarded or failed to apply in any sense with regard to any of the rulings that she made in this case. Appellants concede that, well, there's not any controlling case law in the Fifth Circuit on how to deal with a substitute expert in the scope and how far they're supposed to go. Well, the judge relied upon other district court cases, other circuit cases. There was no controlling law that she ignored or didn't follow. That's not plain error. It doesn't constitute an abuse of discretion. When an expert relies upon propensity evidence that somebody's generally safe, and that they can't give an opinion to a reasonable degree of certainty without that, and a judge excludes that, there's no controlling case law that prevents a district court judge in this circuit from excluding that expert. The plaintiff's burden when they came or the appellant's burden when they came in here was to point to complete disregard of controlling law, manifest error. And they have failed to do so. Because of that, the case should be adjourned. All right. Thank you, sir. All right. Thank you. Mr. DeGravels. In the district court's ruling, she says that, you know, and she rejects the notion that any of this is sanctions. But she goes on to say, you could have easily obtained the services of an accident reconstruction expert and an archery expert at the beginning of the case. My question is, were those types of experts in play, either in this after effect of Dr. Kelcourt's death or otherwise as options, or is the type of expert that the defense has and you have, is that the sort of universal expert who would have expertise about this particular matter? Correct. We're talking about pure biomechanics. Dr. Ray was a biomechanical engineer. Dr. Kelcourt was a biomechanical engineer. They had very similar CVs. We did not have a formal clinical accident reconstruction expert, but the entire involvement of the biomechanical engineers, both from Dr. Ray and Dr. Kelcourt, was this unwitnessed accident, given the interaction between this machine and the human machine, how did this accident occur? An archery expert we did not hire and we did not need to hire. Dr. Kelcourt was not an archery expert. He said in her oath a bunch of times, I can't hit the side of a barn door. I just picked up a bow for the first time in connection with this case. This isn't about one's accuracy. Again, it's about the interpretation. His theory in part was that he stuck his head in the bow itself. I don't know what's your case, but I feel like that would take biomechanics to rebut that notion, but that was your case. She says further, she did not omit your entire report, but those portions of Dr. Kelcourt's report which exceeded or had the new theories. My question is, I think I had asked that initially, and counsel opposite said in his opening that, for the most part, his report was permeated with this habit evidence, et cetera. So my question is, if you took that out, would there have been left an opinion by Dr. Kelcourt, not what you would have wanted to use, but an opinion to use in the trial of the case? Negative, Your Honor. On the habit, let me point out, Dr. Kelcourt did not say that he had only relied on habit evidence, although that's admissible evidence. He also had purely biomechanical scientific reasons. He initially said in his deposition he slipped up. It was in his report. He initially said in his deposition that, yes, if you take away this evidence, then you got me, so to speak. But then he caught himself and said, no, no, I'm sorry. I was rattled, and he corrected himself. So his pure biomechanical reasoning was in his report. His pure biomechanical reasoning, he corrected himself. So he had evidence separate and apart that was based just purely on the physical difficulty of the task that's suggested, that's lagrance terms, of the task suggested by the other side. All right. Counsel, it also says that in your filing, your motion for reconsideration sort of didn't add a fallback. In other words, don't grant the summary judgment. But, you know, if you do, I want to put in Dr. Kelcourt's written report and let's go to trial. He says, you know, that was an opportunity you had. You didn't. You wouldn't all or nothing theory and you should. He doesn't say it that way. Right. That's my characterization. But he basically says the motion consideration was a time in which salvaging Dr. Kelcourt's report, now that you then know that the district court view of it was not an option you exercised. We attempted, I mean, with the, again, what was cut out of the court was essentially the report. Dr. Kelcourt said by affidavit, if I'm looking at this piece of paper and it's got the black stripes, everything, I can't help you, Neil. I can't help you, Sanford family. What's been taken out is my support. In terms of Dr. Ray, again, I'm dealing with a man who either died or was dying of terminal brain cancer. The report put before a jury that's case suicide to any trial practitioner. One last question, which I didn't think of and I guess I could have. At the time the diagnosis was made with Dr. Kelcourt, well, I don't want this to sound like a cruel question, but I'm taking it that his report and so forth, that was all in writing. Is that right? Up to that point? He had a report. I'm trying to get to was there an opportunity to have taken his video deposition and the report while he was alive, if you will, or was the sequence of things just such that that wasn't either practical or humane to do? I would say both. Okay. That's efficient. And may I mention the judge thought so, too. I mean, when she said, look, you get your new guy, it was put out, hey, why don't we go up to Pennsylvania, this guy's hospital bed, to her credit, she said that's absurd. Well, I didn't know the sequence of kind of when the diagnosis occurred, the thought occurred, and in a lot of these cases we get now in which there are video depositions to start with, I mean, way up in the case, and given the intricacy of this case, it would not have struck me if we all had videos of people as well, which wouldn't be the same as putting in a dry report at trial, but it is what it is. His son had called me, Your Honor. His son was the one. Dr. Ray called me from the hospital saying my dad's in the bed, and that's the last word I heard. All right. Thank you. All right. Thank you to both counsel. It's an unusual case, but we will deem it submitted and we'll decide it. That concludes the audience case.